AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

**SEALED**
unsealed on 8/3/2021, JMR

for the

Southern District of California

In the Matter of the Search of

*(Briefly describe the property to be searched
or identify the person by name and address)*

Google LLC
1600 Amphitheatre Parkway, Mountain View, CA 94043
mayssawyer628@gmail.com

)
)
)
)
)
)

Case No.     20MJ3733

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A-2, incorporated herein by reference.

located in the _____Northern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B-2, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

❒ contraband, fruits of crime, or other items illegally possessed;

❒ property designed for use, intended for use, or used in committing a crime;

❒ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18, USC sec. 81 | Arson within special maritime and territorial jurisdiction; Use of fire to damage |
| 18, USC sec. 844(f) | federal property; False statement |
| 18, USC sec. 1001 | |

The application is based on these facts:

See Attached Affidavit of Maya Kamat Special Agent NCIS, incorporated herein by reference.

☑ Continued on the attached sheet.

❒ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under
18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Special Agent Maya Kamat, NCIS
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____telephone_____ *(specify reliable electronic means).*

Date:     09/03/2020

*Judge's signature*

City and state:  San Diego, California

Hon. William V. Gallo, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANTS

I, Maya Kamat, being duly sworn, declare and state:

INTRODUCTION

1.     This affidavit is submitted in support of applications to search Internet Service Providers (ISPs) – Apple Inc., Google, LLC, and Yahoo! Inc. -- for records and data in and related to the following electronic accounts (collectively, "**Subject Accounts**"):

(a) iCloud account associated with mayssawyer628@yahoo.com ("**Subject Account-1**");

(b) Google account associated with mayssawyer628@gmail.com ("**Subject Account-2**");

(c) Yahoo account associated with mayssawyer628@yahoo.com ("**Subject Account-3**");

(d) Yahoo account associated with maysryan980@yahoo.com ("**Subject Account-4**"); and

(e) Yahoo account associated with ryanmays628@yahoo.com (**"Subject Account- 5"**)

as more fully described in Attachments A-1, A-2, A-3, A-4, A-5 respectively, for items that constitute evidence of violations of 18 U.S.C. Sections 81, Arson within special maritime and territorial jurisdiction; 844(f), Use of fire to damage federal property; and 1001, False Statement (the "Target Offenses"), as more fully described in Attachments B-1, B-2, B-3, B-4, and B-5.

2.     Based on the information outlined below, probable cause exists that evidence of the Target Offenses will be found by searching the **Subject Accounts**, the contents of which are stored at premises owned, maintained, controlled, or operated by Apple, Google, and Yahoo.

/ /

/ /

EXPERIENCE AND TRAINING

3.       I am a Special Agent with the Naval Criminal Investigative Service (NCIS), San Diego, California. I have been assigned to NCIS in this capacity since January of 2019. I am currently assigned to NCIS Resident Agency San Diego, CA. My duties as an NCIS Special Agent include, but are not limited to, investigating crimes committed by or against Navy or Marine Corps installations, aircraft, or vessels, investigating crimes involving Department of the Navy or Marine Corps military personnel or civilian employees. Prior to becoming an NCIS Special Agent, I obtained a Bachelors of Arts and Science in Criminal Justice, respectively, from Florida Gulf Coast University, where I graduated Summa Cum Laude. I worked as an intern for the United States Marshal's Service.

4.       My formalized training includes successful completion of the Criminal Investigator Training Program (CITP) at the Federal Law Enforcement Training Center (FLETC), located in Glynco, Georgia. The CITP course includes intensive training on subjects such as interviewing, firearms, digital forensics, and tactical training, as well as extensive legal courses. I have also successfully completed the NCIS Special Agent Basic Training Program (SABTP), which is a 12-week course with curriculum specifically tailored to the unique challenges faced by NCIS. Such training included military law, death investigations, crime scene processing, intelligence, and narcotics investigations. I have apprehended military members. I have served Command Authorization's for Search and Seizure to search persons, vehicles, barrack's room, berthing areas, digital devices, medical records and the like. I have served search warrants for off base related searches. In my training and experience, it is commonly known that people use their cellular phone to research, store images, data, and text messages relating to elements of the crime. I have successfully worked criminal cases regarding, but not limited to: arson, domestic violence, communication of a threat, death, fraud, narcotics, prostitution, and sexual assaults.

/ /

/ /

5.     In addition to my training, I was a member of the NCIS Major Case Response Team (MCRT), and have participated in response to a significant amount of active crime scenes involving military members, many requiring processing of physical evidence in both sterile and contaminated scenes.

6.     I make this affidavit, in part, based on personal knowledge derived from my participation in this investigation and, in part, based upon information from: (a) oral and written reports about this investigation which I have reviewed; (b) physical surveillance conducted by NCIS personnel, which observations have been reported to me either directly or indirectly; and (c) statements of cooperating individuals.

7.     Except as otherwise noted, information set forth in this affidavit has either been observed or provided to me by law enforcement officers with whom I have spoken, who were involved in this investigation, or whose reports I have read and reviewed. Likewise, information resulting from surveillance, except where otherwise indicated, does not necessarily set forth my own observations but rather has been provided directly or indirectly by other NCIS personnel who conducted such surveillance.

8.     Because this affidavit is being submitted for the limited purpose of seeking the search warrant specified below, I have not set forth each and every fact learned during the course of the investigation. Rather, I have set forth only those facts that I believe are necessary to establish probable cause for the requested warrant.

BACKGROUND ON APPLE, GOOGLE, AND YAHOO

9.     Apple Inc. (Apple) designs, develops, and sells consumer electronics, computer software, and online services.  Apple products include the iPhone, iPad, and Mac personal computer.  Apple's online services include iCloud, iMessage, and email. iCloud allows users to store and backup data from all Apple devices including text messages, contact lists, photos and videos, application data, emails, Apple wallet, and documents.  As set forth below, I believe there is evidence of criminal activity contained within Apple associated with **Subject Account-1**.

3

10.   Although most people think of Google, LLC, (Google) as specializing in Internet browsing and search technologies, Google is actually much larger than that.   It provides Internet-related services and products, which also include online advertising technologies, email and file storage and collaboration, cloud computing, and software development tools and technologies. Google's services and products collect and store a vast amount of content and information for a user's account including but not limited to user account profile information, web browser and search activity data, email and voice communication data, file storage and collaboration data, and advertisement and analytics data. As set forth below, I believe there is evidence of criminal activity contained within Google associated with **Subject Account-2.**

11.  Yahoo! Inc. (Yahoo), a wholly owned subsidiary of Verizon Communications, is an Internet company which, among other things, provides electronic communication services to subscribers. Yahoo's electronic mail service allows subscribers to communicate with other ISP subscribers through the Internet. Subscribers to Yahoo use unique screen names and/or email addresses during communications with others. The screen names and/or email addresses may or may not identify the real name of the person using a particular screen name or email account. As set for the below, I believe there is evidence of criminal activity contained with Yahoo associated with **Subject Account-3**, **Subject Account-4,** and **Subject Account-5**.

/ /
/ /
/ /
/ /
/ /
/ /
/ /
/ /
/ /

4

1

PROBABLE CAUSE

2

*Fire on the USS Bonhomme Richard on July 12, 2020.*

3      12.     On July 12, 2020, at approximately 9:30 a.m., the NCIS Resident Agency
4    office in San Diego, CA, became aware of a fire via multiple sources aboard the USS
5    Bonhomme Richard (LHD-6) (hereinafter referred to as "BHR"). Commissioned in 1998,
6    the BHR is a member of the Wasp-class, the US Navy's large-deck multipurpose
7    amphibious assault ship. A total of eight Wasp-class ships were built. All eight ships were
8    in active service prior to the fire onboard the BHR. Wasp-class Landing Helicopter Dock
9    ("LHDs") embark, transport, deploy, command and fully support all elements of a Marine
10   Expeditionary Unit (MEU) of 2,000 marines, inserting forces ashore via helicopters,
11   landing craft and amphibious vehicles. In addition to the 2,000 plus marines it can
12   transport, the BHR has a crew of approximately 1,000 sailors.

13
14
15
16
17
18
19
20
21



U.S. NAVY / GETTY IMAGES

22      13.     On July 12, 2020, the BHR was located at pier 2, berthing 6, on Naval Base
23   San Diego, CA. The fire was first reported at approximately 8:10 a.m., based on the
24   observation of smoke. The fire was reportedly located somewhere inside the lower vehicle
25   stowage ("Lower V"). The general location of the Lower V is marked by a red box in the
26   photograph above. The BHR personnel, Naval Base San Diego Fire Department, and
27   numerous civilian fire departments from the surrounding cities responded to fight the fire.

28

14.   Despite efforts to quickly extinguish the fire, the BHR burned for approximately five days. The fire damaged 470 spaces out of 1400.  It has been reported



that 71 individuals were injured during the firefighting efforts. On July 16, 2020, the BHR was deemed safe for temporary entry and Special Agents from NCIS and the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) made entry into the Lower V area in order assess the scene and determine if ATF's Nation Response Team (NRT) should be activated or if the scope of work could be handled with local resources. Subsequent to the assessment, ATF NRT was activated. On July 18, 2020, the NRT began to evaluate the damage in an effort to obtain the cause and origin of the fire aboard the BHR. The NRT processed the scene in the Lower V of the ship for several days.

The Lower V. is identified by arrow 18 in the diagram above.

*Arson Determination*

15. The ATF Certified Fire Investigator ("CFI") used National Fire Protection Association ("NFPA") 921 – Guide for Fire and Explosive Investigations (2017) (hereinafter referred to as "NFPA 921") during the examination and processing of the fire scene. NFPA 921 establishes guidelines and recommendations used by public and private fire investigators while conducting origin and cause investigations.

16.   An ATF CFI employed a systematic approach and considered relevant data while conducting the origin and cause investigation. The systematic approach was based-

6

on the scientific method, an organizational and analytical process suitable for fire scene investigations, which is also used in the physical sciences.

17.    In order to determine the origin and cause of the fire, an ATF CFI had to ascertain where the fire started (origin) and the circumstances that brought about the fire (cause).

18.    An ATF CFI examined the exterior of the BHR first and moved from areas of lesser damage to greater damage being mindful that the ship burned for several days. The fire damage observed on the exterior of the ship was consistent with a fire that originated inside and migrated out. The ATF CFI examined the interior of the BHR second and determined the fire originated in the Lower V based-on fire damage observed, knowledge of fire dynamics and witness statements.

19.    An ATF CFI determined the fire originated at or near the starboard elevator bulkhead in the Lower V, which was based-on the aforementioned observations, knowledge and witness statements, in addition to arc mapping.

20.    An ATF CFI considered competent ignition sources throughout the Lower V, e.g. electrical, mechanical, smoking, spontaneous heating and open flame as the cause of the fire. Ignition hypotheses were developed, tested and disproven, with the exception of open flame to available combustibles. Among other things, the progression and migration of the fire, coupled with the time in which a witness indicated that he believed he had observed MAYS enter the Lower V (as discussed in detail below) and the report of smoke led the ATF CFI to classify the fire as incendiary[1]. The ATF CFI classified the fire as incendiary based on fire damage observed, his knowledge of fire dynamics, arc mapping results and information collected through witness statements as relayed to him. The ATF CFI subjected his origin and cause opinion to a technical review with other CFIs before rendering his final conclusion.

/ /

---

[1] According to NFPA 921, the cause of a fire may be classified as accidental, natural, incendiary (arson) or undetermined.

*Additional Evidence of Arson*

21.    On July 20, 2020, ATF Investigators found a plastic bottle that contained a small amount of liquid closest to the area of origin in the Lower V. Investigators flagged the plastic bottle, which had no cap, with a piece of fluorescent orange flagging tape around the neck of the bottle and placed it on top of a spool of rope. The tape served to alert crime scene technicians to the bottle's presence so that it could be collected and processed for DNA and fingerprints.  Investigators left the flagged bottle in place at the scene while they continued to process other items of interest.

22.    The next day, on July 21, 2020, upon returning to the scene, members of the ATF observed the plastic bottle was missing and the flagging tape with the same knot and loop used to mark the plastic bottle discarded on the floor. ATF immediately surveyed all members of the NRT and other law enforcement individuals who were processing the Lower V.  None of these officials removed the bottle from the flagging tape or the scene. Investigators stopped processing the fire scene and conducted an exhaustive physical search of the Lower V and found three additional bottles and two aluminum cans. Records checks by NCIS revealed that during the timeframe the plastic bottle with the small amount of liquid went missing, MAYS's duty section had been onboard the BHR providing him or his associates access to the ship and Lower V. DNA was found on the discarded flagging tape. Analysis confirmed it was not MAYS's DNA or the DNA of the ATF investigator who found the bottle.

23.    Investigators recovered the remaining three bottles and two cans. The second plastic bottle had a melted cap attached and contained a small amount of liquid. A third plastic bottle had no cap, was twisted at its approximate center and contained a small amount of liquid. A fourth plastic bottle had a partially melted cap with a hole in the center attached and contained a small amount of liquid. Both of the aluminum cans were open; one contained a small amount of liquid. All of the aforementioned liquid samples were submitted to the ATF Forensic Science Laboratory for analysis. One liquid sample, which

was associated with the second bottle, tested positive for a heavy petroleum distillate. Examples of heavy petroleum distillates include diesel, kerosene and jet fuel.

24.     ATF Investigators also found a number of expended $CO_2$ cartridges throughout the fire debris in the Lower V, some of which were reportedly stored there prior to the fire. However, investigators found additional $CO_2$ cartridges inside the wash tub of a washer/dryer combination unit that appeared to have exploded during the fire, as well as additional cartridges on top of boxes of Purell hand-sanitizer that were inside coils of metal hose line.

25.     On July 22, 2020, Lieutenant Commander Felix Perez, the Damage Control Assistant (DCA), conducted a walk-through of the Upper and Lower V compartments with NCIS and ATF agents. Perez's duties as the DCA entail knowledge of, and responsibility for, all fire-fighting equipment and personnel aboard the BHR. Perez stated there were four fire-fighting stations within the Upper and Lower V areas. Perez noted three of the four fire-fighting stations were not in their normal configuration. One station located on the port side of the Upper V did not have any hoses connected to the fire-fighting station. Perez stated regardless of maintenance status, there should have been hoses on the racks with at least one hose connected to the fire station per normal configuration. The fire station on the starboard side of the Upper V had one hose that was discovered cut during initial firefighting efforts and the second hose ran down the side of the BHR and appeared to be connected to diving equipment.

26.     On July 22, 2020, Perez and the agents also inspected the fire station located at the bottom of the ramp in the Lower V. Perez noted while there were two hoses present on the racks, but not connected to the brass wye valve, he described the fire station as inoperable. Perez indicated the normal configuration would have a brass wye valve, which converts one stream of water from the fire main to two. The two valves could support two hoses, but in the ready position, one of the valves would have one hose connected to the one side of the wye valve with the other open in order to allow sailors to easily observe leaks from a faulty valve above. Perez noted there were no hoses or couplings connected

to the fire station and a brass coupling to the wye valve laid on the deck directly below the fire station. Perez again emphasized that the station was not in its normal configuration. Perez also noted a fourth fire station in the Lower V which was located near the aft conflagration station was found in the normal configuration. Perez recalled an incident approximately four (4) months earlier at another location of the ship where a fire hose was found cut on the fire nozzle end with the fire nozzle missing.

27.     Perez further stated he or his damage control staff walked the aforementioned spaces for inspection on Friday, July 10, 2020 and while it was possible one station could have been overlooked, it was, in his opinion, nearly impossible for three of the four closest to and inside the Lower V to have been missed by damage control personnel. Of note, the fire-station at the bottom of the ramp to the Lower V in particular could have been used by the first responders who went into the Lower V. Perez opined that three of the four fire stations aboard the BHR appeared to be have been purposely tampered with and/or disconnected.

*Identification of MAYS*

28.     Initial witness screenings of approximately 177 service members assigned to the BHR were conducted between June 19, 2020 and June 20, 2020. The screening interviews were administered via written questionnaires.

29.     U.S. Sailor Seaman Kenji Velasco was interviewed several times regarding the fire onboard BHR. In his first interview, he reported that on July 12, 2020, at approximately 0805, while standing watch near the Lower V, he observed a "light-skin male" wearing clean coveralls, a facemask, carrying a silver/metal bucket with both hands in front of his body descend into the Lower V (MAYS). In this initial interview, however, Velasco said he did not recognize the individual. When discussing his questionnaire, Velasco did mention a sailor named MAYS that "hates" the U.S. Navy and the Fleet.

30. Velasco was re-interviewed on several subsequent occasions. Velasco stated that he was standing post at the Upper Vehicle Stowage (Upper V) prior to the fire. This area is directly above Lower V. Velasco worked onboard the BHR in the Deck Department

10

and has extensive knowledge of the layout of the BHR. Velasco stated that he observed an individual enter the "Lower V" area approximately 5 minutes before reports of white smoke. As he passed Velasco, the individual carried a metal bucket in his hands by the bucket itself, rather than its handle, in front of his torso and sarcastically stated, "I love Deck." Velasco did not observe anyone else enter the Lower V area except that individual before the fire started. Velasco and Boatswain's Mate Second Class (BM2) Beau Benson were interacting at Velasco's post when Benson reported seeing white smoke. Benson nor Velasco reported seeing an individual leave the Lower V after the fire started. Velasco stayed at his post until relieved by firefighting personnel and Benson departed to report seeing white smoke. During an interview on July 21, 2020, Velasco said he was "fairly sure" and "90% sure" he saw MAYs descend into the Lower V at 0805 on the day of the fire.

31.     Velasco further explained that in the hours and days after the fire, it had dawned on him that the individual who descended to the Lower V at 0805 on the day of the fire was MAYS's height and build, had fair hair that could be seen coming out from his cover, like MAYS, sounded like MAYS, and said, "I love deck," which is an expression Velasco knew MAYS to say. Velasco further explained that after the fire on the BHR he was attending a muster at the base theater, when he asked MAYS if he had gone to the Lower V before the fire started. According to Velasco, MAYS, replied, "Yes."

32.     In late August 2020, investigators followed up with sailors who may have been in the vicinity of this exchange between Velasco and MAYS. Several sailors said they did not have a recollection from that day. However, MAYS's friend, Gonzalez,[2] said he remembered Velasco asking the question to MAYS and MAYS looking uncomfortable. Gonzalez did not remember MAYS answering.

33.     On July 20, 2020, Benson reported he had a conversation with Velasco in the Naval Base San Diego movie theatre. During this interaction, Velasco told Benson that

---

[2] During an interview, described below, MAYS named two close friends, Matthew Gonzalez and Joshua McGill.

11

while having port side watch on July 12, 2020, Velasco observed an unknown person walk down the Lower V ramp holding something in his/her hands. Benson was not able to give a description of the unknown person or the items he was carrying in his/her hands because Velasco did not provide Benson any identifiers of the unknown person. Benson stated Velasco told him the unknown person stated "I love deck" as he/she walked by Velasco and down the ramp.

34.    On August 29, 2020, Boatswain's Mate Third Class Matthew Betz was interviewed. Betz recounted a conversation he had with Velasco the day after the fire. According to Betz, Velasco told him that he saw someone go down to the Lower V the day of the fire wearing boot camp coveralls and carrying a plastic bucket. Velasco said the person he saw go down to the Lower V said "Fuck deck" or "I love deck" when he went down the ramp. Betz indicated he believed the person Velasco described going down to the Lower V was MAYS because MAYS wore the boot camp coveralls the week prior to the fire. According to Betz, after Velasco described the person he saw going down to the Lower V, Betz told Velasco that sounded like MAYS. Betz said a separate Sailor said MAYS came into the berthing area to tell everyone to get off the ship because the ship was on fire. Betz said MAYS could have went up the escape truck, went into the deck berthing area, and take his coveralls off while wearing his cammies underneath the coveralls. Betz said it is normal for Sailors to wear coveralls over their cammies, because Sailors were not allowed to wear coveralls around base.

35.    On July 21, 2020, Command Master Chief (CMC) Jose Hernandez also identified MAYS as a person who showed disdain towards authority and the U.S. Navy.

36.    A copy of the roster of sailors on board the BHR on the morning of July 12, 2020 showed that Duty Section Six was on duty to which both Velasco and MAYS were assigned. It was also determined that MAYS was not certified in ship board firefighting techniques, also referred to as Damage Control. On July 18, 2020, ATF determined that the fire originated in the Lower V, the same area where Velasco observed MAYS enter, but not exit.

37.    Initial checks of publically available social media web sites showed an Instagram post (depicted below) associated with MAYS, made on June 14, 2020, which stated, "I love the smell of napalm in the morning." Initial checks into MAYS's Navy





sawyermays714 • Follow
San Diego, California

sawyermays714 I love the smell of napalm in the morning 🌴

5w

kszrachel Trading has been a lot more easier with Mr Mark, I invested $1000 and got a return of $10,000 in 7 days his transparency and accountability has always been the best.

173 likes

JUNE 14

Add a comment…

background, revealed that he joined the Navy in 2019 with the intent on becoming trained in the Advanced Electronics Computer Fields. At some point, MAYS changed his career goals to becoming a Navy SEAL, via completion of the BUDS. MAYS started BUDS in approximately October 2019; however, five days after training began, MAYS exercised his option out of training and "Dropped on Request," known as a DOR. The DOR officially ended his pursuit of becoming a SEAL. After his DOR from the SEAL training program, MAYS was reassigned to BHR as an undesignated Seaman. According to Navy leadership, the morale and behavior of sailors who had aspired to become a SEAL, and then find themselves serving in a more traditional role on a Navy ship, are frequently very challenging.

38.    A review of MAYS's screening interview revealed that on July 20, 2020, he participated in Duty Section Six screening interviews. In response to a question on the questionnaire, which asked how he learned about the fire; MAYS wrote that he was in the

Hangar Bay[3] and saw black smoke. In response to a question that asked what time he learned of the fire; MAYS wrote the he found out at approximately 0830 that morning.[4] Another question asked if he was working or scheduled to work in the Lower V area the day of the fire; MAYS replied "No, I was suppose to clean the mouring [sic] stations.[5]"

39.     Additionally, of all the individuals screened, MAYS was the only person who reported smelling "burning fuel/rubbery smell." According to an investigating ATF CFI, the terminology MAYS used to describe the smell of the fire was consistent with items and materials that the ATF observed in the Lower V during their scene examination. In particular, the ATF CFI noted two forklifts had four rubber tires each. On each forklift, the two tires facing the starboard side of the BHR were burned and melted to varying degrees. The ATF CFI also indicated he observed ammunition carts that had hard-cast rubber wheels, which were also burnt to varying degrees.

40.     The questionnaire also asked how individuals felt when they learned about the fire; MAYS reported that he felt a "small amount of adrenaline and anxiety." During the screening process, MAYS reviewed his questionnaire with a NCIS special agent and stated that he had taken a picture of the fire with his cellular phone after he exited the BHR.

41.     Velasco also revealed there are conflagration stations[6] in the "Lower V" where an individual could leave the Lower V without going back up the ramp to the Upper V. Deck Department personnel are responsible for maintaining conflagration stations in Lower V. The Lower V contains two conflagration stations, one at the forward bulkhead

---

[3] Hangar bay is an area for storing/repairing aircraft, and additional equipment or supplies.

[4] This response is inconsistent with VELASCO's observation of him entering the Lower V area around 0805, five minutes prior to the reports of smoke in the Lower V.

[5] A mooring station is an area of the ship used to secure a ship at a berth.

[6] A conflagration station is a small observation room generally used to stand watch of the area while out to sea where a sailor can, among other things, initiate firefighting operations or escape a space.

and one at the aft bulkhead. Each conflagration station contained escape trunks with ladders that only go up out the Lower V. The escape trunks from each conflagration station open to a variety of locations within the ship.

42.     On July 16, 2020, during ATF's initial assessment of the scene, ATF agents noted that the door leading into the BHR's conflagration station at the aft bulkhead, identified as 4-72-2-C, was open while the door connected to the forward conflagration station was closed.

43.     On July 27, 2020, NCIS agents traversed an access trunk on the USS Boxer (LHD-4), a ship that is similar in type, specifically within a conflagration station located at 4-72-2-C. The agents maneuvered from the Lower V to an area between the mess deck and hanger bay areas through an access trunk identified as 2-74-2-T in approximately 23 seconds.

44.     On July 31, 2020, a NCIS agent went to the Lower V of the BHR to the aft conflagration station identified as 4-72-2-C, noted an open access door leading from the Lower V into the conflagration station and noted an additional door inside the conflagration station identified as 4-71-2 that was also open. This door led to an access trunk identified as 4-72-4-T which led to an access hatch in the same location as the one on the USS Boxer. The NCIS agent could not access the closed hatch as it was blocked by fire debris from above.

45.     On July 22, 2020, CMC Hernandez was interviewed by NCIS and ATF agents and explained that, on July 5, 2020, MAYS was sleeping in his assigned berthing during his duty day. Although MAYS was allowed to have personnel items in the berthing area, MAYS was not allowed to be sleeping aboard or during the duty day. MAYS was awaken by a contractor who was working near MAYS's sleeping area identified as rack twenty-seven in compartment 1-25-0-L. MAYS reacted by verbally confronting the contractor in an aggressive way, causing the contractor to report the incident to Navy personnel.

/ /

46.     On or about August 12, 2020, Chief Lino Aguilarbarron provided an oral sworn statement regarding his conversation with MAYS on an unknown date after the fire; where in MAYS told him he had been in the Lower V area the day before for the purpose of storing big hoses known as Replenishment At Sea (RAS) hoses. MAYS stated he did not see anything in the Lower V that would have ignited the fire by itself, more likely the fire was started by someone.

*MAYS's Statement*

47.     On August 20, 2020, MAYS was informed of his rights under Article 31(b), Uniform Code of Military Justice (UCMJ) and waived these rights, agreeing to speak with investigators. In an approximately ten-hour interview (which included multiple breaks for meals, bathroom visits, and a physical walk/tour of the BHR), investigators started by questioning MAYS about his current circumstances. MAYS told investigators that he was currently single. He elaborated stating that he had dated a female sailor, proposed to her at a French restaurant, she had accepted but then deployed to Los Angeles on the USNS Mercy during the ongoing pandemic, she had become pregnant, and MAYS had separated from her after learning he was not the father (as described below, investigators later learned this was mostly contradicted by the female sailor). MAYS stated that he was training for special operations and planned to reapply to become a member of the SEAL teams.

48.     The interview continued with investigators asking MAYS about the day of the fire on the BHR.  MAYS described how the day of the fire was a Sunday and that he had duty.  He had turnover and mustered between 0745 and 0800 with the rest of the onboard duty section on the flight deck.  MAYS had worn his Type 3 (more formal than working coveralls) uniform because he had thought he had the first watch at the brow of the ship (helping to manage the ship, including the checking of IDs for anyone coming onboard).  MAYS began performing his assigned duties of cleaning mooring stations after being directed to do so by BM2 Zappier at muster.  MAYS reported he was in the hangar bay when he became aware of the fire. MAYS described the series of actions he took to

assist fire fighters, alert at least one sailor in crew berthing to the threat of the fire, and how he eventually helped fight the fire. When directly asked, MAYS repeatedly denied having started the fire on the BHR or having been in the Lower V on the day of the fire. He maintained his innocence as to being the cause of the fire throughout the entire interview. At one point, after being told that he had been identified as having descended the ramp to the Lower V, before the fire started, MAYS stated that he was being setup.

49.     Approximately two hours into the interview, MAYS told investigators for the first time that a group of sailors in the Deck Department had discussed that an unknown sailor had seen an individual in coveralls and a mask, carrying a bucket to the Lower V just before the fire started. Investigators had not previously mentioned during the course of the interview that the individual had been seen wearing a mask. At one point MAYS told investigators the witness could not have identified him because, "I had a face mask on."

50.     Investigators asked MAYS the different routes to leave the Lower V, to which MAYS replied a person in the Lower V would be "fucked," implying no way out, if present during a fire. Initially, MAYS said the only route out of the Lower V was to walk up the ramp from the Lower V to the Upper V.  Eventually, MAYS stated he knew about the two conflagration stations in the Lower V because he cleaned them in the past. MAYS also stated he knew one of the conflagration stations terminated at the 01 Level where the Hanger Bay and Mess Decks were located. MAYS claimed the other conflagration station terminated in an area where contractors stored their supplied above the Lower V. Lastly, MAYS admitted he has traversed at least one of the two conflagration station ladders where he learned to "skate off and hide" from work.

51.     Investigators asked MAYS about his Instagram post and he seemed to indicate that it was an homage to Apocalypse Now, the movie he had quoted.

52.     MAYS initially told investigators he lost most of his worldly possessions in the fire because he stored them in berthing aboard BHR, with the exception of his MacBook Pro computer. MAYS indicated he kept the MacBook Pro with him and not

aboard BHR because it was too valuable.

53.    At approximately 6:30 PM, investigators asked MAYS to identify the location of his computer because NCIS agents did not find it in his residence or vehicle while serving search warrants. MAYS replied and stated he owned two computers; one Acer laptop and one MacBook Pro.

54.    According to MAYS, both computers were at his mother's house in Kentucky. MAYS stated his mom purchased the MacBook Pro as a gift when he was a junior or senior in high school. MAYS described the MacBook Pro as the most expensive gift his mom ever purchased for him besides his truck. MAYS told investigators he shipped the MacBook Pro to his mom in Kentucky in March or April 2020 because he had no use for it while in BUD/S in Coronado, California. MAYS told investigators the Acer had always been in Kentucky at his mom's house. MAYS stated there was no password for the Acer computer and claimed he did not remember the password for his MacBook Pro despite having just provided passwords for online accounts.

55.    At approximately 10:45 PM, MAYS told investigators he took the MacBook Pro with him to boot camp in Great Lakes, Illinois in July or August 2019. According to MAYS, he was attending a BUD/S preparatory school in Great Lakes, IL when he posted the MacBook Pro for sale on "GroupMe." MAYS described GroupMe as social media platform used by his pre-BUD/S classmates. MAYS stated he sold the MacBook Pro to a classmate for $700.00. MAYS stated he could not identify the classmate by name.

56.    According to MAYS, his mom routinely asked about his MacBook Pro including after the BHR fire. MAYS told investigators he lied to his mom since selling the computer in 2019.

57.    Investigators asked MAYS to go to the BHR with them and show them where he had been on the ship the morning of the fire. MAYS agreed and walked with them through the BHR. MAYS stated he was willing to take a polygraph examination and eventually asked to take one.

/ /

18

58.     After his interview, MAYS was arrested and began the booking process to be turned over to the brig at Marine Corps Air Station (MCAS) Miramar. During that process, two different Master-At-Arms designated sailors heard MAYS say (unasked) that he was guilty, seemingly talking to himself. They reported their observations to the Command Master Chief who, in-turn, contacted NCIS.

59.     In response, MAYS was immediately brought back to the NCIS office for questioning.   The re-questioning occurred on the same day, August 20, 2020.  Prior to questioning, Investigators reminded MAYS of his Article 31(b) rights, about statements that MAYS made admitting guilt. MAYS denied that he was guilty and denied having said so. Investigators concluded the interview.

60.     The next day, on August 21, 2020, investigators reminded MAYS of his Article 31(b) rights and asked him if he still wanted to take the polygraph test. MAYS waived his rights and agreed to take the test. During the polygraph test, MAYS repeated the version of events he had told investigators about on August 20, 2020. The polygraph examiner found that during the first series of questions that no opinion could be rendered based on physiological data obtained. After a second series, it was determined deception was indicated to the relevant questions.  When he was informed of the possible deception indications, MAYS became extremely upset and denied any involvement in starting the fire.

*Statement of HM3 Armelle Ane*

61.     On August 21, 2020, U.S. Sailor Petty Officer Third Class Armelle Ane was interviewed in regard to her romantic relationship with MAYS. Ane stated that she was not engaged to MAYS and that she was not pregnant. Ane related that MAYS was telling fellow sailors that he was going to be a father and that Ane was pregnant. Ane refuted and stated that she was not pregnant, never became pregnant, and had previously taken a pregnancy test to confirm that she was not pregnant. Ane described MAYS as being volatile and "bipolar."

//

*Execution of Search Warrants*

62.    On August 20, 2020, investigators executed federal search warrants, searching MAYS's apartment, vehicle, cell phone, his person, and taking a buccal DNA swab.

63.    Investigators found and seized 1 uniform pair of pants (type 3s), 3 pairs of boots, laundry booster, assorted letters sent to MAYS, and photos from MAYS's barracks room. One additional letter was recovered from MAYS's vehicle. Additionally, MAYS's iPhone was seized.

64.    Investigators have downloaded MAYS cell phone but the analysis is in its early stages and ongoing. As of this writing, investigators have found no significant inculpatory or exculpatory evidence as relates to MAYS.

65.    A partial male DNA profile was recovered from the flagging tape. Analysis revealed it did not belong to MAYS.

*Identification of **Subject Accounts***

66.    **Subject Account-1, Subject Account-2 and Subject Account-3** were all identified during a manual review of MAYS's iPhone during the execution of the above mentioned search warrant. **Subject Account-4** was identified when MAYS listed it as his email address on his screening questionnaire completed on July 20, 2020. **Subject Account-5** was listed on Navy Federal Credit Union financial records, which were obtained via a Grand Jury subpoena.

BASIS FOR EVIDENCE SOUGHT IN SEARCH WARRANT

67.    Based on my training and experience, consultation with other agents and officers experienced in arson investigations, and all the facts and opinions set forth above in this affidavit, I know that individuals involved with arsons often utilize cell phones and computers to access accounts, including accounts maintained by Apple, Google, and Yahoo, in the weeks and months prior to, during, and after an arson event, so the **Subject Accounts** could contain:

a.    Communications, photographs, videos, or other data depicting

clothing, disguises worn (e.g., masks), tactics, techniques and procedures used to commit the arson and materials used during the arson, along with any trophies seized, and also items related to an individual's motivation for committing arson;

      b.    Internet and web-search history relating to the arson (e.g., research and news articles relating to the arsons to monitor law enforcement's investigation and response to the fire as well as gratification);

      c.    Celebratory remarks or veiled remarks after the arson;

      d.    Geo-locational information related to an arson;

      e.    Communications, photographs, videos, or other data depicting clothing and gear used during an arson or related to the arson itself; and

      f.    Communications about covering up or hiding their crimes and escaping or hiding from law enforcement.

## GENUINE RISKS OF DESTRUCTION OF EVIDENCE

68.    Based upon my experience and training, and the experience and training of other agents with whom I have communicated, electronically stored data can be permanently deleted or modified by users possessing basic computer skills.  In this case, only if the user of the **Subject Accounts** or a coconspirator with access to the **Subject Accounts** receives advance warning of the execution of this warrant, will there be a genuine risk of destruction of evidence.  If this application and order are placed under seal and a preclusion order issues, I do not believe that the **Subject Accounts** user is likely to destroy evidence.

## PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

69.    To date, the United States has attempted to obtain data contained within the **Subject Accounts** by obtaining a search warrant for MAYS's cellular phone. A forensic analysis of that data is ongoing and has not been completed. Additionally, the United States has attempted to obtain data contained in **Subject Account-4** and **Subject Account-5** by obtaining an order authorizing disclosure of information under 18 U.S.C. section 2703(d). Analysis of those subject accounts have not been completed.

PROCEDURES FOR ELECTRONICALLY STORED INFORMATION

70.     Apple, Google, and Yahoo ("ISPs") provide electronic communication services to their subscribers. The ISPs allow subscribers to exchange electronic communications with others through the Internet. The ISPs' subscribers access to their services through the Internet.

71.     Subscribers to the ISPs' electronic communication services use account names during their electronic communications.  The account names may or may not identify the real name of the person using a particular screen name. Although the ISPs requires users to subscribe for a free account, they do not verify the information provided by the subscriber for their free services.

72.     At the creation of the ISPs' account and for each subsequent access to the account, the ISPs log the IP address of the computer accessing the account. An IP address is a unique address through which a computer connects to the Internet.  IP addresses are leased to businesses and individuals by Internet Service Providers. Obtaining the IP addresses that have accessed a particular electronic account often identifies the Internet Service Provider that owns and has leased that address to its customer.  Subscriber information for that customer then can be obtained using appropriate legal process.

73.     Federal agents and investigative support personnel are trained and experienced in identifying communications relevant to the crimes under investigation. The ISPs' personnel are not.  It would be inappropriate and impractical for federal agents to search the ISPs' vast computer network for the relevant accounts and then to analyze the contents of those accounts on the ISPs' premises.  The impact on its business would be disruptive and severe.

74.     Therefore, I request authority to seize all content, including electronic mail and attachments, stored instant messages, stored voice messages, photographs, and any other content from the subject's the ISPs accounts, as described in **Attachments B-1, B-2, B-3, B-4**, and **B-5**.  In order to accomplish the objective of the search warrant with a minimum of interference with the ISPs' business activities, to protect the privacy of its

subscribers whose accounts are not authorized to be searched, and to effectively pursue this investigation, the NCIS seeks authorization to allow the ISPs to make digital copies of the entire contents of the accounts subject to seizure. Those copies will be provided to me or to an authorized federal agent.  The copy will be imaged and the image will then be analyzed to identify communications and other electronic records subject to seizure pursuant to **Attachments B-1, B-2, B-3, B-4 and B-5**. Relevant electronic records will be copied to separate media. The original media will be sealed and maintained to establish authenticity, if necessary.

75.     Analyzing the data to be provided by the ISPs may require special technical skills, equipment, and software.  It may also be time-consuming. Searching by keywords, for example, often yields many thousands of "hits," each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant. Merely finding a relevant "hit" does not end the review process.  Keyword searches do not capture misspelled words, reveal the use of coded language, or account for slang or typographical errors.  Keyword searches are further limited when electronic records are in or use foreign languages. Certain file formats also do not lend themselves to keyword searches.  Keywords search text.  Attachments to electronic mail messages are often in proprietary formats that do not store data as searchable text.  Instead, such data is saved in a proprietary non-text format. And, as the volume of storage allotted by service providers increases, the time it takes to properly analyze recovered data increases dramatically. Internet Service Providers like Google do not always organize the electronic files they provide chronologically, which makes review even more time consuming and may also require the examiner to review each page or record for responsive material.

76.     Based on the foregoing, searching the recovered data for the information subject to seizure pursuant to this warrant may require a range of data analysis techniques and may take weeks or even months.  Keywords need to be modified continuously based upon the results obtained and, depending on the organization, format, and language of the records provided by Google, examiners may need to review each record to determine if it

is responsive to **Attachments B-1, B-2, B-3, B-4 and B-5**. The personnel conducting the examination of the ISPs' records will complete the analysis within **ninety (90) days** of receipt of the data from the service provider, absent further application to this court.

77.     Based upon my experience and training, and the experience and training of other agents with whom I have communicated, it is necessary to review and seize all electronic communications that identify any users of the **Subject Accounts** and any electronic communications sent or received in temporal proximity to incriminating messages that provide context to the incriminating communications.

78.     All forensic analysis of the imaged data will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

PROCEDURES FOR ELECTRONICALLY STORED INFORMATION FOR
COMPUTERS AND OTHER ELECTONIC MEDIA

*Forensic Imaging*

79.     After securing the premises, or if sufficient information is available pre-search to make the decision, the executing agents will determine the feasibility of obtaining forensic images of electronic storage devices while onsite.  A forensic image is an exact physical copy of the hard drive or other media.  A forensic image captures all the data on the hard drive or other media without the data being viewed and without changing the data.  Absent unusual circumstances, it is essential that a forensic image be obtained prior to conducting any search of the data for information subject to seizure pursuant to this warrant.  The feasibility decision will be based upon the number of devices, the nature of the devices, the volume of data to be imaged, the need for and availability of computer forensics specialists, the availability of the imaging tools required to suit the number and nature of devices found, and the security of the search team.  The preference is to image onsite if it can be done in a reasonable amount of time and without jeopardizing the integrity of the data and the agents' safety.  The number and type of computers and other devices and the number, type, and size of hard drives are of critical importance.  It can take several hours to image a single hard drive - the bigger the drive, the longer it takes.

As additional devices and hard drives are added, the length of time that the agents must remain onsite can become dangerous and impractical.

80.     If it is not feasible to image the data on-site, computers and other electronic storage devices, including any necessary peripheral devices, will be transported offsite for imaging. After verified images have been obtained, the owner of the devices will be notified and the original devices returned within ninety (90) days of seizure absent further application to this court.

*Identification and Extraction of Relevant Data*

81.     After obtaining a forensic image, the data will be analyzed to identify and extract data subject to seizure pursuant to this warrant.  Analysis of the data following the creation of the forensic image can be a highly technical process requiring specific expertise, equipment and software. There are thousands of different hardware items and software programs, and different versions of the same programs, that can be commercially purchased, installed, and custom-configured on a user's computer system.  Computers are easily customized by their users.  Even apparently identical computers in an office or home environment can be different with respect to configuration, including permissions and access rights, passwords, data storage, and security. It is not unusual for a computer forensic examiner to have to obtain specialized hardware or software, and train with it, in order to view and analyze imaged data.

82.     Analyzing the contents of a computer or other electronic storage device, even without significant technical challenges, can be very challenging.  Searching by keywords, for example, often yields many thousands of hits, each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant. Merely finding a relevant hit does not end the review process for several reasons. The computer may have stored metadata and other information about a relevant electronic record – e.g., who created it, when and how it was created or downloaded or copied, when it was last accessed, when it was last modified, when it was last printed, and when it was deleted. Keyword searches may also fail to discover relevant electronic records, depending

on how the records were created, stored, or used.  For example, keywords search text, but many common electronic mail, database, and spreadsheet applications do not store data as searchable text.  Instead, the data is saved in a proprietary non-text format.  Documents printed by the computer, even if the document was never saved to the hard drive, are recoverable by forensic programs because the printed document is stored as a graphic image. Graphic images, unlike text, are not subject to keyword searches.  Similarly, faxes sent to the computer are stored as graphic images and not as text. In addition, a particular relevant piece of data does not exist in a vacuum. To determine who created, modified, copied, downloaded, transferred, communicated about, deleted, or printed the data requires a search of other events that occurred on the computer in the time periods surrounding activity regarding the relevant data.  Information about which user had logged in, whether users share passwords, whether the computer was connected to other computers or networks, and whether the user accessed or used other programs or services in the time period surrounding events with the relevant data can help determine who was sitting at the keyboard.

83.    It is often difficult or impossible to determine the identity of the person using the computer when incriminating data has been created, modified, accessed, deleted, printed, copied, uploaded, or downloaded solely by reviewing the incriminating data. Computers generate substantial information about data and about users that generally is not visible to users.  Computer-generated data, including registry information, computer logs, user profiles and passwords, web-browsing history, cookies and application and operating system metadata, often provides evidence of who was using the computer at a relevant time.  In addition, evidence such as electronic mail, chat sessions, photographs and videos, calendars and address books stored on the computer may identify the user at a particular, relevant time.  The manner in which the user has structured and named files, run or accessed particular applications, and created or accessed other, non-incriminating files or documents, may serve to identify a particular user. For example, if an incriminating document is found on the computer but attribution is an issue, other documents or files

created around that same time may provide circumstantial evidence of the identity of the user that created the incriminating document.

84.     Analyzing data has become increasingly time-consuming as the volume of data stored on a typical computer system and available storage devices has become mind-boggling.  For example, a single megabyte of storage space is roughly equivalent of 500 double-spaced pages of text.  A single gigabyte of storage space, or 1,000 megabytes, is roughly equivalent of 500,000 double-spaced pages of text.  Computer hard drives are now being sold for personal computers capable of storing up to 2 terabytes (2,000 gigabytes) of data.  And, this data may be stored in a variety of formats or encrypted (several new commercially available operating systems provide for automatic encryption of data upon shutdown of the computer).  The sheer volume of data also has extended the time that it takes to analyze data.  Running keyword searches takes longer and results in more hits that must be individually examined for relevance.   And, once reviewed, relevant data leads to new keywords and new avenues for identifying data subject to seizure pursuant to the warrant.

85.     Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including hashing tools to identify data subject to seizure pursuant to this warrant, and to exclude certain data from analysis, such as known operating system and application files. The identification and extraction process, accordingly, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within one-hundred twenty (120) days of this warrant, absent further application to this court.

86.     All forensic analysis of the imaged data will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

87.     After extraction of the data, law enforcement personnel will separate out relevant information as described in **Attachment B-1, B-2, B-3**, **B-4,** and **B-5**. After the review is completed, non-relevant information (apparent innocent third party information)

1   will be preserved with an evidence custodian but not accessed again post-review absent

2   further authorization from the Court.

3                    REQUEST FOR SEALING AND PRECLUSION OF NOTICE

4          88.    At this time, MAYS is not aware of the full extent of the investigation. I

5   believe that, if MAYS and any potential co-conspirators were to learn NCIS were

6   investigating them, they would take steps to evade prosecution and would also seek to

7   destroy evidence.

8          89.    Accordingly, I am requesting that this Affidavit, Applications For Search

9   Warrants, the Search Warrants, and Sealing Motions and Orders related to the **Subject**

10  **Accounts** be sealed until further order of the Court, and Google be precluded from

11  notifying the subscriber for a period of six months, that is, no earlier than **March 3, 2021.**

12  I am requesting a six-month preclusion period because investigators are reviewing a

13  voluminous amount of evidence in furtherance of the investigation, including digital

14  records. Further, it can take ISPs four weeks or longer to respond to warrant requests.

15  Accordingly, I believe that preclusion of notice is necessary for a six-month period to

16  avoid alerting the target(s) of this investigation to the full nature and scope of the

17  investigation, which would likely result in the destruction of evidence. MAYS has already

18  given contradictory statements about the location of his computer, possibly for the purpose

19  of frustrating the investigation.

20  //

21  //

22  //

23  //

24  //

25  //

26  //

27  //

28  //

CONCLUSION

90.     Based on the foregoing, I believe there is probable cause to believe items that constitute evidence of violations of federal criminal law, namely, 18 U.S.C. Sections 81 (Arson within special maritime and territorial jurisdiction), 844(f) (Use of fire to damage federal property), 1001 (False statements), and that evidence of said violations as described in **Attachments B-1, B-2, B-3, B-4, and B-5** will be found in/at/on the properties to be searched, as provided in Attachments A-1, A-2, A-3, A-4, A-5**.**

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

_____
Maya Kamat
Special Agent
Naval Criminal Investigative Service

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 03rd day of September, 2020.

_____
HON. WILLIAM V. GALLO
United States Magistrate Judge

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# **ATTACHMENT A-2**

## DESCRIPTION OF THE ACCOUNT TO BE SEARCHED

Information associated with the Google email account "mayssawyer628@gmail.com" ("**Subject Account-2**") that is stored at premises controlled by Google, a company whose headquarters is located at 1600 Amphitheatre Parkway in Mountain View, CA.

## <u>ATTACHMENT B-2</u>

### I.     Service of Warrant

The officer executing the warrant shall permit Google, LLC, as custodian of the computer files described in Section II below, to locate the files and copy them onto removable electronic storage media and deliver the same to the officer.

### II.    Items to be Provided by Google, LCC

Any and all messages, e-mails, records, files, logs, or information (whether deleted or not) concerning:

A.     All records or other information regarding the identification of the account, to include subscriber information, full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, e-mail addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

B.     Any and all available location data;

C.     All photos and/or videos stored by an individual using this account;

D.     All messages sent or received by an individual using this account from **June 1, 2020 to August 21, 2020**;

E.     All messaging application data stored or backed up by user;

F.     The types of service utilized by the user; and

G.     All records pertaining to communications between Google, LLC and any person regarding the account, including contacts with support services and records of actions taken.

//

//

37

**III**.    **Items to be Seized as Evidence**

The search of the data supplied by the Google, LLC pursuant to this warrant will be conducted by NCIS as provided in the "Procedures For Electronically Stored Information" of the affidavit submitted in support of this search warrant and will be limited to the seizure of:

a.    Communications, records, and attachments tending to identify the research or viewing of news articles, reports, or other information related to arson or starting fires or covering up crimes, including information related to the July 12, 2020 fire aboard the USS Bonhomme Richard;

b.    Communications, records, and attachments tending to identify or explain a motivation to commit arson aboard the USS Bonhomme Richard;

c.    Photographs or videos depicting coveralls, a bucket, fire, smoke, implements for starting a fire, accelerants, or possible trophies from the arson on the USS Bonhomme Richard;

d.    Location data tending to identify travel to and from, or presence aboard the USS Bonhomme Richard on July 12, 2020 and July 20 to 21, 2020; and

e.    Communications, records, and attachments that provide context to any communications described above, such as electronic mail sent or received in temporal proximity to any relevant electronic mail and any electronic mail tending to identify users of the subject accounts for the **period from June 1, 2020 to August 21, 2020**;

**which are evidence of violations of 18 U.S.C. Sections 81, 844(f), and 1001.**

The seizure and search of the Subject Account shall follow the procedures outlined in the supporting affidavit.